[Civ. No. 10248. First Appellate District, Division One.—January 27, 1937.]

In the Matter of the Guardianship of the Persons and Estates of ERIC C. DeBRATH et al., Minors. GREY WORS-WICK, Appellant, v. GLORIA VAUGHN DeBRATH WAINWRIGHT, Respondent.

698

Lloyd W. Dinkelspiel, Martin Minney, Jr., and Heller, Ehrman, White & McAuliffe for Appellant.

Frank W. Creely and Ernest S. Leslie for Respondent.

KNIGHT, J.—Three petitions were filed in the Superior Court in and for Alameda County for the appointment of a guardian of the persons and estates of the above-named minors, Eric C. and Eve DeBrath, aged respectively ten and seven years. One was filed by Mrs. Grey Worswick, a stranger in blood to the children, with whom the children were then living; another by Mrs. Gloria Vaughn DeBrath Wainwright, the mother of the children; and a third by Sylvia Chaldecott, an aunt, who asked to be appointed guardian in the event the mother's petition was denied. Answers were filed to each petition and the proceedings were ordered consolidated for hearing, and were heard before the Honorable Leon E. Gray, Judge. A large number of witnesses testified, several depositions were read, and many exhibits introduced, so that the evidence covers more than 1,000 typewritten pages of the transcript. At the conclusion of the hearing the court granted the mother's petition and denied those of Mrs. Worswick and the aunt; and this appeal has been taken by Mrs. Worswick.

The trial court's decision contains its findings of fact and conclusions of law pursuant to which a judgment was entered. Among the ultimate facts found were: That Mrs. Wainwright, the mother of the children, was in all respects a fit and proper person to have the care, custody and control of said children, and to be appointed their guardian; that she maintained and was capable of maintaining a suitable home for them; that she had not knowingly or wilfully abandoned said children, or having the ability so to do failed to maintain said children; that it was for the best interests of said children and each of them, in respect to their temporal, mental and moral welfare, that the mother be appointed their guardian; and that Eric, the boy, was not of sufficient age to form an intelligent preference as to who his guardian should be. One of the main grounds of appeal is that the evidence is insufficient to sustain the foregoing findings.

Prior to the filing of any of said petitions the mother of the children, on June 4, 1935, filed in said superior court a petition for a writ of *habeas corpus,* seeking thereby the release of the children from the custody of Mrs. Worswick. In her return to the writ Mrs. Worswick urged dismissal of the proceeding upon the ground that subsequent to the filing of the petition for said writ and prior to the service of the same upon her, she instituted in said superior court a proceeding for her appointment as guardian, and that therefore jurisdiction to determine the issue of the custody of the children was exclusively within the probate court. The Honorable Fred V. Wood (since deceased), before whom the *habeas corpus* proceeding came on for hearing, overruled the plea in abatement urged by Mrs. Worswick and proceeded with the hearing of the issues raised by the allegations of the petition and the return filed thereto by Mrs. Worswick; and on June 28, 1935, he filed a written opinion wherein, after reviewing the evidence, he directed that for the reasons stated in the opinion the custody of the girl be awarded to the mother, and that the custody of the boy be awarded to Mrs. Worswick. But in said opinion it was expressly stated that in the pending guardianship proceeding which was thereafter to be heard (and which was heard and decided some two months later by Judge Gray), "the Probate Court must determine whether it will be necessary to appoint a guardian for either or both of said minors," and that the probate court

"may also, if it assumes guardianship of either or both minors, modify or change its orders from time to time." At the outset of the trial of the guardianship proceedings, however, Mrs. Worswick, contrary to the position she had taken before Judge Wood, contended, and she alleged in her answer as a bar to granting the mother's petition, that Judge Wood's decision in the *habeas corpus* proceeding was *res judicata* of the guardianship proceeding. Judge Gray found otherwise, however; and the second main ground urged for the reversal of the judgment in the present proceeding is that the evidence is insufficient to sustain said finding.

The children were born in Los Angeles, and are the issue of the marriage of respondent and Eric DeBrath, both of whom are British subjects. The boy was born in 1925, and the girl in 1927. In June, 1931, after having lived in the United States for about nine years, the parents moved from Hollywood where they were then residing, to Papeete on the island of Tahiti, and took the children with them. At that time respondent's brother-in-law was operating a hotel in Papeete named the Blue Lagoon Hotel, and after the DeBraths arrived they purchased his interest in the hotel, and thereafter respondent operated the hotel under a lease from the owner of the property, and her husband engaged in and carried on a photography business.

Appellant lives in Alameda in a home owned by her. She was divorced in 1927, and receives an income of $1,000 a month from property acquired during marriage. She also owns securities estimated to be of the value of about $40,000. It appears she traveled much of the time, and in the fall of 1931 she visited Papeete, remaining there for about a month; and while there she became acquainted with the DeBraths and their children. She again visited Papeete in 1932. This time she remained six or seven months, during which she became very friendly with the respondent; and as will hereinafter more particularly appear, upon her return to California in November of that year she was permitted to take the children with her. There is ample evidence to show, however, that the understanding was that she was not to have the permanent custody of the children. In this regard it appears that at this time respondent was having serious domestic and financial troubles. Her husband paid little or no attention to his family, and he was intoxicated most

of the time. More than a quarter of the white population of Papeete is transient, and at this particular time, which as will be noted was when the depression was evidently at its worst, the hotel business had fallen off so that respondent was having much difficulty in meeting the operating expenses. In that situation respondent confided her troubles in and counseled with appellant. Among other things discussed by them was the matter of respondent obtaining a divorce; also the subject of the welfare of the children, about which respondent admittedly expressed deep concern. Eventually, at appellant's request and solicitation, respondent consented to allow appellant to take the children away with her temporarily until respondent could adjust her affairs. The parties are not agreed as to the exact conversation which took place between them in arriving at this understanding, but if there be any conflicts, under well settled rules, on appeal they must be resolved in favor of respondent; and in this connection respondent testified that appellant said to her, "Won't you let the children come to me and stay with me until you get your affairs in order. I see you have to divorce your husband, and it is not possible for you to go on like this, and this environment is very bad for yourself and the little children. . . . Let me take them away and I will take care of them until you get your affairs in order; I would love to do that." Continuing, respondent testified that appellant told her that she had a fine home in Alameda, that she was well-to-do financially, and that she wanted to do this for respondent. Respondent expressed deep gratitude for the offer, saying "it was a Godsend". But when respondent told her husband about it, he mistrusted appellant's purpose and at first refused to consent to let the children go unless appellant signed a written agreement that she would return the children within three years. Respondent persuaded her husband, however, that in view of appellant's generous offer and the promises she had made, a written agreement was unnecessary, and that to demand it would be an act of discourtesy to appellant; consequently later DeBrath agreed to the proposition but insisted on having a written agreement to the effect that appellant was to maintain the children without cost to the parents, and which provided also that neither parent would ask for the return of the children without the consent of the other. Thereupon and in November,

1932, appellant and the children sailed for California, and the children remained with appellant until these proceedings were instituted early in June, 1935.

In January, 1933, respondent obtained a divorce in Tahiti from DeBrath and was awarded the custody of the children. Early in 1934 appellant visited Papeete, but she went alone, leaving the children in charge of her housekeeper in Alameda; and later during that year respondent came to California to visit the children at appellant's home. She remained in California approximately three months, and in December, 1934, after returning to Papeete, she married Cyril Wainwright, who for two and a half years had been employed by her as the manager of the Blue Lagoon Hotel. Early in 1935 respondent wrote to appellant that she would like to have the children and asking appellant to bring them down over the summer holidays. In the latter part of the following April appellant went to Tahiti, but as before she went alone, leaving the children in charge of her housekeeper; and upon her arrival in Papeete the dispute started over the return of the children. Appellant claimed that respondent asked her to send the little girl to Tahiti alone, and that she refused to do so. Respondent claimed that she asked appellant to bring both children, and that appellant refused to bring either. Bitter words ensued, and finally appellant told respondent that she did not consider her a fit mother for the children nor Tahiti a fit place for them to live; and that she would never give them back; whereupon respondent caused a revocation of the written agreement to be served upon appellant; and appellant and respondent embarked on the next boat for California, arriving here at the end of May; and respondent immediately instituted the *habeas corpus* proceeding.

In addition to respondent's testimony relating to the understanding that appellant was to have the children only temporarily, other witnesses were produced, friends of appellant, who testified that while visiting appellant's home after she had taken charge of the children she stated to them that she had taken the children only temporarily and that therefore she would not allow herself to become too greatly attached to them. And it also appears from all the letters respondent wrote to appellant while the children were living with appellant that she retained a very deep motherly af-

fection for the children and had no intention whatever of giving them up permanently. From the foregoing it will be seen that there is substantial evidence supporting the trial court's negative finding on the issue of abandonment.

██  With respect to the question of respondent's fitness to have the custody of her children and to provide them with a suitable home, the evidence is sharply conflicting. We are convinced, however, that the testimony adduced on the part of respondent is legally sufficient to sustain the trial court's findings on these issues. Appellant's contention that respondent was unfit was based upon an attack she made on respondent's moral character. In this connection appellant sought to prove that while respondent was still the wife of DeBrath and before she married Wainwright she carried on an illicit love affair with a man named Rosskam, and later with another man referred to in the record as Philip; and that while she was carrying on these affairs she was neglectful of the welfare of her children. The evidence introduced by appellant to substantiate these charges consisted of testimony given by herself and a maid who had visited Papeete with her and had been in her employ for upwards of twenty-five years; also the depositions of two Papeete witnesses, certain correspondence, and the testimony of the boy Eric. On the other hand, respondent emphatically denied having any illicit relations with either of these men, or having neglected her children. And she produced some six reputable, disinterested witnesses, men and women, who had visited Papeete and stayed at the Blue Lagoon Hotel during part of the time appellant charges respondent was guilty of immoral conduct, all of whom testified that they saw no misconduct on respondent's part and that her reputation for morality and chastity was good, and that she took good care of her children. Some of these witnesses remained in Papeete for four months; others for six months. Among them was the daughter of Gouverneur Morris, the author. As stated, the trial court found in respondent's favor on these issues, and as above pointed out, there is ample testimony to support its finding; consequently there could be no useful purpose served in narrating all of the details of the evidence offered by appellant in support of her charges of immorality. Part of the correspondence above referred to consisted of two documents written by Rosskam, who professed

to be a poet, and was staying at the hotel with his wife. Neither document was addressed to respondent. One was a salacious poem. The other was a letter written by Rosskam to appellant just before she left Tahiti with the children. Both documents, and especially the letter, are of such a character as to justify the trial court in believing that the author of them was entirely lacking in honor or decency, and that therefore the contents of both documents were unworthy of consideration. Moreover, it would appear that at best both documents constituted the rankest kind of hearsay, and therefore possessed no evidentiary value whatever as proof of immorality on the part of respondent. The remaining correspondence consisted of letters which respondent had written to Philip and to appellant about Philip. It doubtless appears therefrom that at the time the letters were written respondent was infatuated with the man; but the letters do not reveal that there had been any illicit relations between them. Furthermore, the evidence shows that this man left Tahiti permanently in 1932; that he took the same boat which brought appellant and the children to California; and according to appellant's testimony his last known address was London. The explanation given by appellant as to the manner in which she obtained possession of the letters written by respondent to this man was that more than two and a half years prior to the present controversy, for some reason unknown to her and which is unexplained by the record, he voluntarily mailed the letters to her. In any event, approximately two years after his permanent departure from Tahiti, respondent married Wainwright; and there is no evidence whatever showing that since her marriage to Wainwright her conduct has been subject to criticism.

As to the boy's testimony, it is quite evident from reading it that he is bright and above the average intelligence for a lad his age; but it also appears that his mind is evidently given to romancing, and that some of the tales he told as to his escapades in Papeete are, to say the least, inclined to be fantastic. For instance, one of the stories told by him was that while living there he had seen his baby sister attacked by a native; whereas the boy's father in his deposition, and his mother in her testimony, denounced the story as being wholly without truth. The evidence further shows that after the boy's arrival in appellant's home he was disobedient;

that he had to be spanked and otherwise punished; also that after appellant placed him in a private school his conduct was so unruly and his influence on the other children so demoralizing that the school authorities refused to allow him to remain in the school. Afterwards he was privately tutored, and later placed in another private school. Moreover, evidence was introduced showing circumstances from which the trial court might reasonably infer that the boy had been coached in his testimony (not, however, by any of his attorneys), before he appeared in court as a witness.

Appellant charged also in opposition to granting the mother's petition that Tahiti was not a fit place to rear the children. She so testified herself, and her testimony was supported by two Californians who had visited the island on pleasure trips. However, there is an abundance of evidence to the contrary. Besides her own testimony, respondent produced a number of witnesses, all of whom testified that good common schooling was there available. Some of these witnesses had lived in Tahiti for years, and were well acquainted with conditions in Papeete and particularly with the educational facilities there; while one or two were married women, who while visiting the island had placed their children in the local schools. Tahiti being a French possession, the French language is taught in the schools, and it may be conceded that the educational system there is not to be compared with the California schools. But since the parents of these children are not American citizens, the trial court was justified in concluding that there was no obligation resting upon them, legally or otherwise, to educate their children in American institutions; nor can the fact that under the circumstances the parents are not inclined so to do be considered as legal ground for depriving them of the custody of their children. It is doubtless true, as the evidence shows, children living in Papeete, as in other tropical islands, live a free and easy life, quite different from those who are reared in this country. They dress scantily, bathe in the ocean and play about the highways and in other public places. But even so, it cannot be held as a matter of law, contrary to the conclusions reached by the trial court, that such a life is in itself destructive of their temporal, mental, or moral welfare. And it may be here stated that while the father of the children, on account of his conduct, may have for-

feited any right of control over the children, he has in his deposition unequivocally declared that respondent is a fit and proper person to have their custody and that Tahiti is a fit place to raise them.

Secton 1406 of the Probate Code provides in part that if a child be of sufficient age to form an intelligent preference "the court may consider" that preference in determining the question of guardianship. In the present case appellant offered expert testimony to show that the boy was of the grade of intelligence of a child about fourteen years of age; and he was allowed to express the preference that he wanted appellant appointed his guardian. ▮ In view of this situation appellant argues that the trial court failed to give any consideration to the boy's preference. It is evident from the record, however, that the court did give consideration thereto, but refused to be bound by the boy's wishes; and it may be gathered from the record bearing upon this point that one of the reasons which prompted the court to refuse to grant the boy's request was because of the evidence tending to show that the boy had been coached.

So far as the law of the case is concerned, there is little to discuss or decide. Section 1406 of the Probate Code, which is the main controlling statute involved, provides: "In appointing a general guardian of a minor, the court is to be guided by what appears to be for the best interest of the child in respect to its temporal and mental and moral welfare; and if the child is of sufficient age to form an intelligent preference, the court may consider that preference in determining the question . . . " In this connection appellant argues that inasmuch as the legislature repealed section 1751 of the Code of Civil Procedure and section 246 of the Civil Code at the time it enacted section 1406 of the Probate Code, it is no longer the law of this state as was provided in those sections that the father or mother of the child under fourteen years of age, if found to be competent, "is entitled" to be appointed guardian in preference to others. And in this regard it may be stated that on this appeal the fitness of appellant to be appointed guardian is not questioned; nor could it be, because the court made an affirmative finding that she was fit and competent to be appointed as such, and the evidence supports said finding. Moreover, in fairness to appellant it may be said that the evidence shows that she

is much attached to the children, and particularly to the boy; that she is able financially to care for them, and that since they have been in her custody she has done much for them in the way of furnishing them with necessary medical aid, educating them, and improving their condition generally; that she has traveled with them, and even took them to England to visit their grandparents. Nevertheless, it is still the law of this state, as declared by section 1407 of the Probate Code, that "Of persons equally entitled in other respects to the guardianship of a minor, preference is to be given as follows: (1) To a parent . . . " And aside from statutory law, it has always been held in all jurisdictions that preference should be given to a parent. A person seeking to wrest the custody of a child from its parents may be in a far better position financially to do much more for the child than the parent might do in the way of furnishing the child with better surroundings in which to live, and better training and education; but it has never been held, nor does appellant contend, that for these reasons alone a parent is to be deprived of the natural right to raise his or her own child.

In the present case there is not the slightest evidence to show that respondent has been prompted by any other feeling or motive than a deep motherly affection, to regain the custody of her children. There is no suggestion made anywhere that the children will come into any inheritance; or that respondent ever intimated that appellant should pay her any money for any purpose. On the other hand, the evidence shows without dispute that after the departure of the children from Papeete respondent kept in constant touch with them by mail; that within two years she made the trip to California to visit them; and that as soon as she learned of appellant's purpose to keep the children permanently, she took the first boat to California, and fought strenuously to regain their custody.

After all, the determination of the controlling issues suggested by section 1406 rests almost entirely in the sound discretion of the trial court. Here the trial continued over a period of some eight days. Forty odd witnesses testified; and during the trial the interested parties and the children were before the court so that it had full opportunity to observe and study their demeanor and actions. Consequently, the trial court was and is in a much better position than the

reviewing court, which decides the appeal from the record alone, to pass upon the vital questions of fact involved in the selection of a guardian; and after an examination of the entire record we are satisfied that the trial court's conclusions are supported by substantial evidence.

As pointed out by appellant, Judge Wood in the *habeas corpus* proceeding took a very different view of the situation. His written opinion contained a severe arraignment of respondent, following which he held in substance and effect that she was an unfit parent to rear children. Nevertheless, as stated, he directed that she be allowed to take the little girl. However that may be, we have no authority on this appeal to inquire into the evidence adduced in the *habeas corpus* proceeding for the purpose of ascertaining whether the views expressed by Judge Wood are supported thereby; and even if such authority did exist, the record of the evidence taken in that proceeding is not before us. ▮ Moreover, and in any event, it is our opinion that the decision in the *habeas corpus* proceeding cannot be held to be *res judicata* of the guardianship proceeding; and consequently Judge Gray was in no manner bound by the conclusions reached by Judge Wood. Admittedly in *habeas corpus* proceedings, where the question of the illegal restraint of an infant is involved, the court hearing and deciding the *habeas corpus* proceeding has the power to make provision for the temporary custody of the minor in case of its release; that is, until the question of its permanent custody can be heard and determined. (13 Cal. Jur. 279.) But manifestly the probate court is the proper forum, and a guardianship proceeding is the one designated by the statute wherein the question of its permanent custody must be adjudicated; and it is apparent from that part of Judge Wood's opinion hereinabove quoted, that he recognized that such was the law. It is true that there are cases holding that the adjudication in one *habeas corpus* proceeding is *res judicata* and binding upon the parties in a second *habeas corpus* proceeding involving the same questions, but appellant concedes that she has found no decision in point in this state sustaining her contention that the adjudication in a *habeas corpus* proceeding is *res judicata* in a guardianship proceeding involving the question of permanent custody. Nor do we find anything in the

decisions cited by appellant from other jurisdictions which would tend to alter the views hereinabove expressed.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 25, 1937.