Filed 8/7/13  Guardianship of A.N. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Guardianship of the Person of A.N., a Minor. | |
| MICHAEL HOLDSWORTH et al., | F064141 & F065188 |
| Petitioners and Respondents, | (Tulare Super. Ct. Nos. VPR045374 & VFL218211) |
| v. | |
| JEREMIAH N., | **OPINION** |
| Objector and Appellant. | |

-ooOoo-

APPEAL from judgments of the Superior Court of Tulare County.  William Silveira, Jr., Judge.  (Retired Judge of the Tulare Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Joan A. Watters for Objector and Appellant.

Law Offices of Katherine E. Donovan and Katherine E. Donovan for Petitioners and Respondents.

-ooOoo-

**INTRODUCTION**

After a bench trial, the probate court granted guardianship of minor, A.N., to her maternal grandparents over her father's objection. She was six years old at the time. The court subsequently acknowledged that it relied on inadmissible hearsay and did not believe there had been "a fair hearing." The court purported to grant the father's request for "reconsideration" (Code Civ. Proc., § 1008) of the guardianship order. The court ordered another hearing at which the parties were permitted to call witnesses who did not testify at the initial trial. After this second hearing, the court declined to alter its prior order granting guardianship. Father appeals from the initial order granting guardianship after the first trial, and two postjudgment orders regarding attorney fees.

We conclude that the admission of improper evidence at the initial trial was prejudicial. We further conclude that the court's order granting "reconsideration" was in fact an extrajurisdictional order for a new trial. We therefore reverse the order granting guardianship.

We reject father's attacks on the postjudgment attorney fees orders.

**FACTS**

**A.**

**GUARDIANSHIP**

Respondents Michael H. and C.H. petitioned the court for temporary and permanent guardianship of their granddaughter, minor A.N.[1] When the petition was

---

[1] We refer to relatives by their first names only and to the minor by initials only for privacy purposes. We intend no disrespect.

filed, Objector and Appellant Jeremiah N. (Jeremiah) had legal and physical custody of A.N.[2]

The petition alleged that A.N. was being subjected to physical and emotional abuse, primarily by father's girlfriend, S.W.

The court determined that A.N.'s mother, Elizabeth, consented to the guardianship request. C.H.'s declaration in support of the petition acknowledged that Elizabeth, her daughter, "has struggled with drug addiction for the past three years" but indicated that she had been sober "since June of 2010."

C.H.'s declaration stated that A.N.'s teacher had expressed concerns regarding A.N.'s " 'diminishing spirit.' " The teacher had referred A.N. to a Special Friends Program, which allowed A.N. to spend one hour per week with an adult for play time and conversation. The declaration indicates that S.W. contacted the teacher and told her that A.N. was no longer allowed to participate in the Special Friends Program. The declaration states, "As the teacher told my husband that [A.N.] would no longer be allowed to meet with 'Special Friends Program' tears welled up in her eyes."

**Temporary Guardianship Hearing**

On April 28, 2011, the court held a hearing on the request for emergency temporary guardianship. A.N.'s father, Jeremiah, opposed the petition. He appeared at the hearing in propria persona and indicated that the petition was "basically all hearsay." Both Jeremiah and S.W. testified at the temporary guardianship hearing and denied the allegations of physical abuse.

C.H.'s daughter, Erin, is A.N.'s aunt. Erin testified at the temporary guardianship hearing that she observed bruises on A.N. She asked A.N. how she came to be bruised, and A.N. replied that it was from a chair. A short time later, Erin again asked A.N. how

---

[2] The court transferred custody of A.N. to petitioners on August 30, 2011. The record reflects no intervening changes in custody from the time the petition was filed until August 30, 2011. However, A.N. would spend the night with petitioners sometimes.

3.

she came to be bruised. A.N. eventually said, " 'Okay, don't tell her but it was [S.W.]' " A.N. explained that S.W. hit her because she had torn up a piece of paper.

C.H.'s declaration attached to the petition indicates that she then took A.N. to a police station to make a report. At the temporary guardianship hearing, C.H. testified that the police officer at the station indicated he would refer the matter to "CPS." Jeremiah testified that he spoke to the same officer the day before the hearing. He indicated that the officer told him that he did not feel there were grounds for a criminal investigation. The court indicated that it was "interesting" that the matter was not referred to the district attorney for possible criminal prosecution.

C.H. testified at the hearing that A.N. had told her that S.W. "pinches," "spanks" and "pushes" her. C.H. further recalled that she had spoken to Jeremiah once after observing a welt on A.N., and asked him to stop. She said Jeremiah indicated it would never happen again.

Petitioners' counsel indicated at the hearing that Jeremiah planned to move to Oregon with A.N.

The court then responded to the hearsay objection Jeremiah had made at the beginning of the hearing. The court stated, "Mr. [N.] said that some of this was hearsay, but there are exceptions to the hearsay rule and one of the exceptions is a statement by a child as to her existing state of mind and bodily condition and so I realize that this is coming from an aunt that the child said it. The child is not here for examination but it is concerning, but I want you to know that I view it as competent evidence."

The court ruled that it had "heard enough to warrant an investigation" and ordered that one be initiated by the court's own investigator, Family Court Services. (See Prob. Code, § 1513, subd. (e).) The court also ordered that A.N. be kept in Tulare County during the investigation. The court ruled that it could not find irreparable harm or immediate danger, and therefore denied the petition for temporary guardianship. The court ordered "no corporal punishment" of A.N., no "disparaging remarks" be made to

4.

A.N. about her parents, stepmother, or grandparents, and no discussion with A.N. about the "issues of this case."

The court appointed an attorney for A.N., Paula Abbiss. The court stated that A.N.'s counsel "will be directed to consult with the child's teacher and to determine whether the teacher viewed it to be in the child's best interest to remain in the Special Friends Program or to be withdrawn so she could focus more on her academic needs.…" The court indicated that there would be a hearing to determine whether Jeremiah had ability to pay for A.N.'s counsel. The court directed Jeremiah to file an income and expense declaration for that purpose.

Petitioners' counsel requested that A.N. undergo counseling, and Jeremiah agreed. The court ordered counseling as follows:

> "So, so you [Jeremiah] can enroll her, you consult with Ms. Henson [petitioners' counsel] regarding the therapist. It will be the order, my order that this is to be the child's therapist, not the grandparents' therapist and not the parents' therapist. It's to be the child's therapist and the therapist will simply be told that the child is involved in a custody proceeding and that she appears dispirited and she's distractible in school. Okay. That's all the therapist needs to know, nothing more … and number two, that it be a therapist who will be willing to provide information to the Court because some of them will not."

Jeremiah asked whether "they will have contact with the therapist as well as [A.N.'s] attorney?"[3] The court responded, "No, just [A.N.'s] attorney. The only contact with the therapist will be you to take the child for the appointments. If you don't have reliable transportation, then you're to contact the grandparents and have them transport her." Eventually, Janet Hunsaker became A.N.'s therapist.

The court consolidated the petition with the dissolution proceedings of Jeremiah and A.N.'s mother, and set a hearing for June 29, 2011.

---

[3] The "they" in this statement presumably refers to petitioners.

## "Move Away" Order Request

On June 8, 2011, Jeremiah filed an Order to Show Cause requesting an order permitting him to move to Oregon with A.N. In a supporting declaration, Jeremiah indicated that he wanted to move to attend the University of Oregon. His employer was transferring him to Eugene, Oregon.

Elizabeth opposed the move away order request. In her responsive declaration, she indicated that she had been sober for over 11 months. She stated that Jeremiah's planned move to Oregon did not appear well thought out.

C.H. also opposed the move away order, indicating that she was devastated that Jeremiah was considering taking A.N. away. In her declaration, she said, "I have addressed my concerns to [Jeremiah] about their use of corporal punishment, as well as them being overly strict with [A.N.]… " She believed that Jeremiah was not demonstrating good decision making. She questioned how Elizabeth could rebuild her relationship with A.N. if the move was allowed. She also believed that S.W.'s "stepping in to be mom so quickly has had a negative effect on [A.N.]." Michael also opposed the move away order, expressing concern that A.N. will get attached to another mother-figure that could abandon her.

Jeremiah filed a supplemental declaration in support of the move away order. The declaration explained Jeremiah's preparation for the move and future plans if the request was granted. He indicated that A.N. told him that petitioners frequently allow A.N. to be with Elizabeth unsupervised. A.N. told him Elizabeth had said A.N. does not have to do what she is told because Jeremiah and S.W. were no longer allowed to discipline her. A.N. indicated that Elizabeth told her they would be living together soon.

Jeremiah argued that the petitioners' different views about discipline were not relevant. "Their attitude towards parenting is entirely laissez-faire, no boundaries. At every opportunity they have attempted to portray my daughter as a victim.… Just

6.

because a child is unhappy about being disciplined does not mean they are being abused. They create excuses for her negative behavior rather than consequences.…"

The hearing on the move away order was set for July 7, 2011. The parties stipulated that the petition hearing, previously scheduled for June 29, 2011, would be set on the same day as the move away order, July 7, 2011. The hearing was continued twice. Jeremiah withdrew his request for a "move away" order on August 25, 2011.

**Initial Guardianship Report**

An initial guardianship report was filed on June 23, 2011, by the superior court's investigator, Family Court Services (court's investigator)

*Jeremiah and S.W.*

The court's investigator interviewed Jeremiah and S.W. Jeremiah indicated that he has been living in the home of a friend since May 2011. Jeremiah stated that he planned to move to Eugene, Oregon with A.N. and S.W. He planned to attend college and work at an Olive Garden.

Jeremiah and S.W. denied abusing A.N. and denied engaging in domestic violence. They reported the bruises on A.N.'s back discussed by Erin were caused when A.N. fell off an office chair. They stated that they do not spank A.N. and have never left any bruises on her body. Jeremiah indicated that the petitioners did not have any problem with his parenting until they became aware that he planned to move to Oregon. Jeremiah also said that C.H. had told A.N. that she would do anything to prevent them from leaving for Oregon. Jeremiah stated that the petitioners fail to provide structure for A.N. when she is at their home, such as an appropriate bed time and hygiene.[4]

---

[4] The text of the court investigator's statement indicates that a "Ms. [N.]" made this statement. Literally, the moniker "Ms. [N.]" would most accurately describe Elizabeth N. However, the sentence appears in a paragraph with Jeremiah's statements. Elizabeth's statements are contained under an entirely separate subheading. Moreover, Elizabeth was supportive of petitioners and would likely not have made this statement.

S.W. stated that she loves A.N. and would never hurt her. She said that A.N. calls her "mommy" by choice. She also recalled volunteering in A.N.'s class.

The court's investigator toured the home and described A.N.'s room as "a large spare room which is also the laundry room." It was clean and organized with a twin bed.

*Elizabeth N.*

Elizabeth N. stated that she has been sober for the past year. She indicated that she was not ready to have custody of A.N., but that she wanted to be involved in A.N.'s life.

*Michael H. and C.H.*

The court's investigator met with petitioners, Michael H. and C.H. Their home was clean, the refrigerator was stocked with appropriate food items, and there was a room for A.N.

C.H. stated that she once saw a bruise on A.N. and talked to Jeremiah "about not using corporal punishment." She indicated that Jeremiah said he would never do it again. Petitioners stated that A.N. has said that Jeremiah "hits his girlfriend in the face.…"

According to the court investigator's report, Michael H. and C.H. "stated they are very concerned the father plans to move with the minor to Oregon.…"

*A.N.*

The court's investigator interviewed A.N. on June 14, 2011. She was clean and appropriately dressed for the weather. She said that she loved her dad, her mom S.W., her "real" mom, and her grandparents. She stated that she felt safe with her father, S.W. and her grandparents. She indicated that she had been disciplined in her home by being spanked with an open hand on her buttocks, but she was no longer spanked "because her

---

We believe it amply clear that this was a typographical error and should read, "Mr. [N.]." The attribution of this statement is not dispositive to any issue on appeal.

grandmother told the court." The investigator observed A.N. interacting with Jeremiah and S.W. in an appropriate and "loving" manner.

*Kindergarten Teacher*

The court's investigator interviewed A.N.'s kindergarten teacher. She indicated that the petitioners had misconstrued her statements about A.N. She told the court's investigator that she never saw any signs of abuse towards A.N. by Jeremiah or S.W.

*Criminal History*

The report indicates that a CLETS and SUSTAIN records check was performed as to Jeremiah and Elizabeth N. Criminal histories were found as to Jeremiah and Elizabeth N. A SUSTAIN records check was performed as to S.W. and petitioners. No criminal history was found as to S.W. or petitioners.

*Conclusions*

The court investigator concluded that "the granting of a guardianship petition does not appear to be warranted or in the minor's best interest at this time.…" The court's investigator recommended that the petition not be granted.

**Minor's Counsel's Statement**

Minor's counsel, Paula T. Abbiss, filed a Statement of Issues and Recommendations with the court on August 24, 2011 (Abbiss's statement[5]).

*Petitioners*

Abbiss interviewed petitioners, Michael H. and C.H. Petitioners indicated that A.N. has resided with Jeremiah for approximately the past 20 months. During that time, petitioners stated they maintained regular contact with A.N., including providing transportation to school and "weekend time." They also indicated that they have provided financial and transportation-related support for A.N.

---

[5] We refer to Ms. Abbiss by name to distinguish her from Mr. Minyard who was later appointed as counsel for A.N.

Petitioners conveyed that A.N. had told them Jeremiah "hit" S.W. They claimed that A.N. stated that S.W. "pinches her and hits her." A.N. told petitioners she got into trouble with Jeremiah because she received a "warning" at school. As a result, A.N. was not allowed to play.

The report states, "Petitioners did confirm during my initial meeting with them that Mother [Elizabeth] has been spending weekends in their home while [A.N.] was there, and that she had been sleeping in the room with her unsupervised.…"[6] Minor's counsel discussed with petitioners "[t]he issue of 'supervision' and what that entailed .…" Minor's counsel conveyed her concerns to petitioners' counsel. The report notes that following these discussions, petitioner C.H. contacted her office "to apologize and advise that she had located the supervision requirement in the Court's order and that she would be abiding by the same."

Petitioners also stated that there "was no ill intent" behind the reference to S.W. as " 'the S word.' "

Abbiss notes in her statement that while she was with petitioners outside, Elizabeth was permitted to go into the house with A.N. Abbiss discussed the issue with petitioners, who indicated that they did not believe the court's order prohibited unsupervised time with Elizabeth. C.H. subsequently contacted Abbiss's office to apologize and advise that she had located the supervision requirement in the court's order.

The report states, "Parenting of [A.N.] during this time was also concerning.…" C.H. gave A.N. an instruction, followed by Michael. Then, Elizabeth "intervened" and instructed A.N. "somewhat differently."

---

[6] It seems there had been a prior order granting custody to Jeremiah, which required that A.N.'s visits with Elizabeth be supervised.

*Elizabeth*

Elizabeth indicated that she is not employed and relies on her parents for support. She wanted to have regular and frequent contact with A.N. She was concerned that S.W. "still uses corporal punishment." Elizabeth also indicated that Jeremiah "does not understand that by moving out of state that he will be taking [A.N.] away from people that are important to her (her siblings, her mother, her grandparents)."

Elizabeth told Abbiss that A.N. had asked her, "Mommy what makes you not go to heaven[?]"[7]

Elizabeth stated that A.N. told her that [S.W.] does "really mean things … she pinches and hits and cuts up pictures." Elizabeth admitted to sleeping in the same room as A.N. at petitioners' house. She also admitted talking to A.N. about the court's orders in the case.

*Jeremiah and S.W.*

Abbiss interviewed Jeremiah and S.W. They both denied any physical or verbal abuse in their relationship. S.W. stated that she has a positive and loving relationship with A.N.; that A.N. calls her "mommy" on her own accord; and that she volunteers in A.N.'s class.

Jeremiah indicated that he disciplines A.N., including taking away toys and movies, implementing time-outs and, on no more than five occasions, spanking her with an open hand on her bottom. When asked about the bruises referenced in petitioners' initial claims in support of the petition, Jeremiah and S.W. recounted A.N. spinning around on a chair that eventually broke.

Jeremiah confirmed that petitioners did provide transportation for A.N. during the 2010-2011 school year.

---

[7] The record does not indicate why Elizabeth felt this question from A.N. was pertinent, nor why minor's counsel included it in the statement.

11.

Jeremiah and S.W. indicated that A.N. has returned from visits with petitioners stating that she was told not to call S.W. "mommy." A.N. told them that C.H. has her refer to S.W. as " 'the S word.' " A.N. also told Jeremiah that Elizabeth lives with the petitioners. A.N. also conveyed that C.H. told A.N. that Jeremiah is hitting her.

Jeremiah indicated that he did not believe guardianship was necessary or appropriate. He stated that his relationship with A.N. was positive and open. Conversely, petitioners were unable to discipline her and have a history of parenting failures.

*Confidential Attachments*

Several attachments to Abbiss's statement were filed confidentially. These attachments included a letter from therapist Janet Hunsaker addressed to Ms. Abbiss (Hunsaker letter), and notes of interviews with Jeremiah's twin daughters and A.N. Jeremiah was not permitted to view these confidential attachments prior to or during trial.

Nonconfidential portions of the report summarized the confidential attachments. We quote the report's nonconfidential summarization of the confidential material to avoid inadvertently disclosing confidential material.[8]

Hunsaker Letter

A nonconfidential portion of Ms. Abbiss's report contained an excerpt from Ms. Hunsaker's confidential letter as follows:

> " '[A.N.] is a pretty, blond, blue-eyed, active 6 year old child who is currently being torn apart[.] On the one hand, there is the threat that her primary attachment figure will be taken from her. On the other hand, it appears [S.W.] is in a power struggle for 'possession' of [A.N.]. Father appears marginalized as he has chosen to acquiesce to her wishes. [S.W.] sees herself as [A.N.]'s mother and appears angry that others (the court, the grandparents, biological mother, and counselor) are interfering with her parenting of 'her' child. This is dichotomous [*sic*] because [A.N.] reported

---

[8] By respecting the confidentiality order, we are not determining its validity or propriety.

12.

she feels excluded, marginalized, unloved, unimportant, and the target of [S.W.]'s considerable anger. It is unclear why [S.W.] would fight so hard to maintain 'custody' of a child she has little or no interest in parenting.

"In short, there are grave concerns about the health, safety, and emotional and physical well-being of this child. If the family is allowed to move away, [A.N.] is at greater risk of physical and emotional abuse. If the family remains in Tulare County, the child remains at risk of physical and emotional abuse.' "

Interview of Jeremiah's Twins

Minor's counsel's report does not summarize the interview of Jeremiah's twins. The only record of the interview is minor's counsel's notes, which were marked confidential. The substance of this interview is not dispositive on appeal.

Interview of A.N.

A nonconfidential portion of Ms. Abbiss's report describes her interview with A.N. as follows:

"Counsel's initial interview with minor [A.N.] occurred in counsel's office. A second interview was conducted in the home of Petitioners. Due to concerns regarding the safety of said minor, the details of said interview will be filed under confidential seal. It is requested that the Court not allow dissemination of said report directly to the parties.

"In summary, [A.N.] expressed fear of [S.W.] and ongoing punishment. She stated that she felt like she was always in trouble. Despite this stated fear, she was also clear to state that she loves her "Mommy, Daddy, Sissies, Grammy and Poppy, and Mommy [S.]

"During my second contact it was noted that [A.N.] had several lesions (which [A.N.] refers to as 'bites') all about her body. There were red, raised, and scabbed lesions in her hair, at the base of her scalp, on her back, on her arms and on her legs. There were scabs falling off in her hair and [A.N.] said that she was very itchy and Father and [S.W.] made her wear gloves at home so she wouldn't scratch (even to eat).…

"[A.N.] thinks that if she moves to Oregon maybe then [S.W.] will not be as mad at her all of the time and things will be better. [A.N.] did advise me during our last contact, however, that her daddy wasn't moving to Oregon anymore and she would be staying in Exeter with [S.W.] and going to school there this year."

*Conclusions*

Minor's counsel, Ms. Abbiss, recommended that the petition be granted. She recommended that A.N. be afforded contact with Jeremiah, but that S.W. not be present during those contacts. Abbiss expressed concern that "[P]etitioners may allow Mother unauthorized contact with [A.N.] while she is in their home or not have a clear understanding of orders made as to visitation.…" She further recommended that Elizabeth be granted weekly supervised visitation; "said visitation NOT to include overnights and that Mother's contact be supervised, not simply in the home of Petitioners."

## The Initial Trial

The trial on the petition was held on August 30, 2011. Petitioners' counsel indicated that petitioners had not yet attended guardianship orientation, nor had they completed a "live scan."

Before testimony was taken, the court received into evidence the court investigator's report filed June 23, 2010, and Ms. Abbiss's Statement of Issues and Recommendation filed August 24, 2011. There was a discussion between the court and counsel regarding home videos Jeremiah intended to offer into evidence. Jeremiah's counsel made an offer of proof and the court ruled:

> "… Now then I will consider them and I will consider them on this basis, the Court has been given hearsay statements by way of reports of minor's counsel and declarations filed by the Petitioners that the child expresses fear of her father and her stepmother."[9]

The court continued its ruling, stating:

> "[T]he Court realizes that the things that the child has told Ms. Hunsaker [A.N.'s therapist] and Ms. Abbiss [minor's counsel] and possibly the grandparents [petitioners] are hearsay, the Court tends to allow evidence of

---

[9] At this point, petitioners' counsel objected to calling S.W. "stepmother." A brief colloquy ensued before the court continued its ruling.

14.

those statements as evidence of the child's state of mind which is evidenced in these proceedings and on that basis the Court believes it's appropriate that I allow these DVD videos that were taken of the child interacting with … [Jeremiah] and [S.W.] and her step siblings."

Jeremiah's counsel then objected to Ms. Hunsaker's letter on the basis of bias. He stated that Jeremiah observed petitioners remaining in the clinical setting of A.N.'s sessions with Hunsaker. The court did not sustain the objection, but stated: "[Y]ou have a right to subpoena her here and cross-examine her and if you wish to do that I will continue this hearing briefly for those purposes." Jeremiah's counsel replied, "We'll submit on what's been offered."

The court received the confidential reports attached to minor's counsel report. The court permitted Jeremiah's counsel to review the confidential report, but Jeremiah himself was not permitted to see them.

The court viewed home videos submitted by Jeremiah.

Jeremiah testified that S.W. drives A.N. to her school, approximately 2.3 miles from his home. The court questioned Jeremiah on how A.N. came to sustain mosquito bites. Jeremiah testified that he took her hiking in the Kaweah Oaks Preserve and Sequoia National Park. He testified that he treats the bites with hydrocortisone cream and a triple antibiotic cream. The court noted that there are topical preparations that can prevent mosquito bites, and Jeremiah responded that he uses "deet." He further testified that A.N. would scratch her bites frequently, causing cellulitis. The court asked whether he continued to take A.N. on trips after she was exhibiting lesions, to which Jeremiah responded: "We haven't gone on one in a few weeks now. We let them heal." C.H. testified that A.N. had insect bite scars on her arms, legs and back of her neck. They were in different stages of healing, and she also had fresh bites.

Jeremiah testified that they were living in a home at the time of the hearing. The woman that owned the home was allowing Jeremiah to stay there rent-free.

15.

## Trial Court's Decision to Grant Guardianship

The court announced its decision to grant the petition immediately after closing arguments. The court found that Jeremiah does not "take into consideration the child's emotional needs and welfare." First, the court found that Jeremiah was planning to move to Oregon "without considering the effect of that move on the child." The court also stated, "I do believe that there is domestic violence in this house, it has been reported of the arguments that [Jeremiah] gets into with [S.W.] and including, including physical." The court found that Jeremiah "has permitted [S.W.] to assume parenting responsibilities for this child that are not appropriate .…" The court stated its belief "that some of the discipline imposed here has caused the child to be very fearful of him and [S.W.] and this has come out pretty strongly in her interviews – in her counseling with Ms. Hunsaker as well as her interview with Ms. Abbiss." The court stated it was "concerned that there has been some neglect" that was "not serious" and "not enough alone to find detriment."

> "But, when this evidence, when considered in its totality … rises to the level of detriment in this Court's opinion. She has shoes that are ill fitting. She has mosquito bites that have given rise to a serious medical condition and I have concern about this. Because I know what it's liked [*sic*] to be raised around mosquitos. I lived on ranches when I was a child, there was no mosquito control, we're talking late 40's, early 50's, but we did not and I realize that the child can be especially sensitive to mosquitos, I realize that, but I have what is reported here regarding that child's medical condition reflects a lack of appropriate steps to prevent her exposure. If a child is reflecting these kind of reactions to mosquito bites, the answer is not to continue going to the Kaweah Oaks Preserve or places in the parks where there are mosquitos. The answer is to keep her away from mosquitos. That wasn't done."

> "[S]o all of these factors that I cited and as cited in Ms. Abbiss'[s] report lead the Court to believe that it would be detrimental for this child to remain in the custody of her parents."

The court ordered that Jeremiah "will have the right to visit with this child at reasonable times and places and Ms. Abbiss has made suggestions that those visits take place other than in [S.W.'s] presence, so that will be my order. And he may visit with her

16.

one day a week, a day of his choosing when she's not in school. He needs to work this out with the [petitioners]."

The court ordered that Elizabeth was not permitted to sleep with A.N. nor was she to supersede petitioners' "directives." The court ordered that Elizabeth could have unsupervised visits with A.N. for "two hours."

The court ordered:

> "There will be no corporal punishment by anybody in this trial and, further, no one is to discuss the evidence that was discussed by the Court nor revealed in minor's counsel report nor by Ms. Hunsaker. So there will be no discussion of that with this child and if I find that it happens, I'll find that it would be extremely detrimental for any adult to do that .…"

The court ordered that a review hearing occur on October 11, 2011, to ensure that the petitioners completed guardianship orientation and Live Scan requirements.

**Jeremiah's Motion for Reconsideration**

On September 9, 2011, Jeremiah filed a "Motion for Reconsideration and/or Set Aside of Order Granting Petition for Guardianship" under sections 473 and 1008 of the Code of Civil Procedure. The motion was made on the grounds that (1) petitioners failed to complete a background check or attend guardianship orientation; and (2) no "investigation was undertaken" regarding Elizabeth N. The hearing date was originally set for October 5, 2011.

**September 12, 2011, Ex Parte Application for Stay of Order**

On September 12, 2011, Jeremiah filed an ex parte application to stay the court's order granting petitioners' guardianship over A.N. The purpose of the request was to allow Jeremiah "a meaningful opportunity to challenge the orders [granting guardianship] made in this Court and, if necessary, in the Court of Appeal." The court denied the application in an order also dated September 12, 2011. The court concluded that Jeremiah failed to make a sufficient showing of irreparable harm, immediate danger or

17.

other statutory basis for ex parte relief. The court further noted that a hearing on the merits of the underlying motion was set for 23 days later, on October 5, 2011.

**Request to Disqualify Judge Silveira**

There is an indication in the record that Jeremiah filed a request to disqualify Judge Silveira on September 23, 2011. The request itself is not included in the record. The request was apparently denied in an order dated December 1, 2011.

**Jeremiah's Supplemental Filings RE: Motion for Reconsideration**

On September 13, 2011, Jeremiah's counsel filed a supplemental declaration, presumably in support of his motion to reconsider.[10] The declaration stated that Elizabeth was taking a drug called Buprenorphine. The declaration raised the possibility of A.N. accidentally and fatally ingesting the drug during unsupervised contact with Elizabeth. A correspondence from Jeremiah's counsel to petitioners' counsel was attached to the declaration. The letter conveyed these concerns at greater length to petitioners' counsel.

Jeremiah's counsel filed another supplemental affidavit on September 15, 2011. The affidavit contended Child Welfare Services (CWS) records favorable to Jeremiah were "not available at time of trial." The affidavit described the CWS records as contradicting minor's counsel's report in a couple respects. Minor's counsel's report indicated A.N. denied any abuse to CWS, but then undermined that determination by claiming that CWS interviewed A.N. "while in the care of her Father." The affidavit indicates that CWS records showed that A.N. was interviewed at school, entirely outside of Jeremiah's presence. Jeremiah's affidavit does not explain why these CWS documents were "not available at time of trial."

---

[10] The declaration does not explicitly state that it was made in support of that motion, but it does include the scheduled date and time for the hearing on the motion to reconsider.

On September 22, 2011, in opposition to Jeremiah's motion for reconsideration, C.H. and Michael H. each filed separate declarations, a joint responsive declaration, an opposition/memorandum of points and authorities, and exhibits.

On September 27, 2011, Jeremiah filed a document entitled "Reply Declaration" that was, in substance, a memorandum of points and authorities. On October 3, 2011, Jeremiah filed a supplemental declaration "in support of application for rehearing." On the same day, he filed a document entitled "Augmentation of Record; Due Process Argument." Petitioners filed a request to strike each of these three documents. They argued that the "Reply Declaration" exceeded the 10-page limit set forth in Tulare County Superior Court Local Rules, rule 902(a). Petitioners also contended that all three filings violated Code of Civil Procedure section 1005, subdivision (b) requiring replies to be filed and served five court-days prior to the hearing.

A minute order reflects that a hearing did take place on October 5, 2011. The order notes that Judge Silveira had a pending disqualification request under Code of Civil Procedure section 170.1. Thus, the matter was continued to December 6, 2011, for a case management conference.

On October 6, 2011, Jeremiah filed an objection to petitioners' request to strike his reply papers.

**September 19, 2011, Ex Parte Application**

On September 19, 2011, Jeremiah filed an ex parte application requesting court orders: (1) suspending unsupervised visits between Elizabeth and A.N.; (2) requiring that visits between Elizabeth and A.N. be supervised by persons other than C.H. and Michael H.; (3) revoking the prior order granting guardianship; (4) requiring Michael H. and C.H. to attend mandated guardianship orientation and fingerprinting; (5) a continuance until Michael H. and C.H. complied with alleged fingerprinting requirements; (6) imposing monetary sanctions against Michael H. and C.H.; (7) ordering Family Court Services to confirm that Michael H. and C.H. complied with Local Rule 1007 and file a supplemental

19.

report regarding the results of their fingerprinting; and (8) dismissing "the matter" in its entirety. The face sheet of the application indicates a hearing date of September 20, 2011.

An order dated September 20, 2011, indicates that a matter was brought before the court for ex parte hearing. The matter was taken under submission and the order indicates that the court would review the "Mark G vs John G case."[11]

Jeremiah's counsel filed a letter brief the following day, along with a proposed order, a legal article, and a copy of *In re Guardianship of Christian G.*, *supra*, 195 Cal.App.4th 581.

The court ultimately denied the ex parte application. In its ruling, the court found that the application did not present matters proper for ex parte relief. The ruling stated: "Virtually all of the information presented was either considered by Judge Silveira at the time he heard the guardianship matter or was available to the parties for presentation at that time, including the recently submitted case authority." The ruling concludes, "There is a pending motion for reconsideration before Judge Silveira at which these matters may be fully considered in a more appropriate procedural manner and where all parties will have an opportunity to be heard."

**CWS Referral and November 3, 2011, Ex Parte Application**

In orders dated October 14, 2011, and October 20, 2011, the court referred the matter to CWS for an investigation pursuant to Probate Code section 1513. On November 3, 2011, Jeremiah filed another ex parte application, again requesting that the court vacate the order granting guardianship until the Probate Code section 1513 investigation was completed. A minute order reflects that the court denied the application, as it was "not an emergency hearing."

---

[11] Presumably a reference to *Guardianship of Christian G.* (2011) 195 Cal.App.4th 581.

**CWS Report**

On November 22, 2011, CWS filed its report pursuant to the court's referral. The report included a description of an interview with A.N. In the interview, A.N. said that S.W. "was mean to her, would yell at her, ground her when she got in trouble and would hit her." She described an incident where S.W. spanked her, which " 'really hurt and left a bruise.' "

She said that S.W. and Jeremiah would yell at each other, but she had never seen them become physically violent. She said that S.W. was never physically abusive towards her, "such as hitting, slapping, or pinching."

When asked about the time she had a bruise on her back, she said she did not remember or know, but that she thought she fell off a chair. When asked where she wanted to live, she said she wanted to live with her maternal grandparents but wants to continue visiting with Jeremiah. She said she did not wish to visit with S.W.

The report concluded that there was "no evidence to support that the child has been abused or neglect [*sic*] while in the care and custody of the father as defined by the Penal Code .…" The report indicated that CWS would not be filing a petition in juvenile court, and that the child was safe with her current guardians.

**December 6, 2011 Hearing**

The record contains a minute order from a December 6, 2011, hearing. The court set a briefing schedule for the attorney fees requests and the motion for reconsideration. A further hearing was set for January 17, 2012.

**Miscellaneous Filings**

On December 21, 2011, S.W. filed a declaration describing what she had learned in parenting classes. On December 22, 2011, Jeremiah filed an ex parte application for an order unsealing minor's counsel's report, permitting S.W. to be present during Jeremiah's visits with A.N., and clarifying the time, place and duration of Jeremiah's visits. The application was granted, "in part." The court's order on the application

21.

"allow[s] the Report's [*sic*] of Minor Counsel to be provided to the Respondents [*sic*] Counsel."**12** The court also ordered that the parties were not allowed to discuss the reports with "the children." The order set a status hearing for January 4, 2012.

On January 3, 2012, Jeremiah filed a document entitled "Brief in Response to the Court's Suggestion for Stipulation and Order for New Trial and Child Custody Evaluator." The brief indicated that an in camera meeting between the court and counsel for both parties had occurred on December 22, 2011. It further indicated that the court asked the parties to consider a stipulation and order granting a new trial. The brief argued that a motion for new trial was not available, pursuant to Probate Code section 1453. A January 4, 2012, minute order states that the court "strikes" the brief filed by Jeremiah's counsel, but permits the brief to be resubmitted as an attachment to another brief due on January 17, 2012. The court vacated the January 17, 2012, hearing and reset it for February 8, 2012.

**Hearing on Motion for Reconsideration**[13]

The hearing on the motion for reconsideration was held February 8, 2012. The court announced its tentative decision to grant reconsideration. The court stated:

> "The tentative decision is going to be to reconsider this matter. I am reconsidering it on the basis that I believe that the decision I made was

---

[12] This ruling is confusing, considering that the court had already permitted Jeremiah's *counsel* to view the report.

[13] A successful motion for reconsideration usually results in two rulings: (1) the decision to grant reconsideration (i.e., the decision to reconsider the matter); and (2) the decision after reconsideration (i.e., the decision to affirm the court's prior substantive ruling or the decision to change it). (E.g., *San Francisco Lathing, Inc. v. Superior Court of San Francisco* (1969) 271 Cal.App.2d 78, 84 [court grants motion for reconsideration, then reaffirms its prior substantive ruling].) Here, there was a hearing on whether to grant reconsideration on February 8, 2012. We refer to this as the "hearing on the motion for reconsideration." The court granted the motion, and set a further evidentiary hearing to decide whether it would change or affirm its prior substantive ruling granting the petition. We refer to this later hearing as "the rehearing."

22.

based on a great deal of hearsay evidence, which was formerly admissible in family law proceedings but has not been since 2010. It's also the law that any evidence that isn't objected to can be considered by the Court; nonetheless, we are talking about a fundamental right of a parent to have custody of a child. And I don't believe under the circumstances that there was a fair hearing and that I could fairly consider all the evidence. So I intend to reopen the hearing to allow cross-examination of the witnesses and presentation of new witnesses. [¶] This case presents a number of procedural difficulties and so I want to make it clear that this order is part of my reconsideration. In other words, I will reconsider by hearing additional evidence and having witnesses cross-examined and then I will issue a final decision about the order I made granting the guardianship. So I view this as part of the reconsideration process and that's my ruling."

The court indicated that it would issue a written ruling on the motion in the future.

The court declined to vacate the prior order granting guardianship. The court continued, stating:

"So we have – so we have to examine that evidence and you can, if you wish, present these children, his daughters as witnesses, I will consider that testimony, you can subpoena any other witnesses you wish. But I'm going to – I view this as a matter in which I have to take testimony from witnesses and have them cross-examined and then I will issue my final decision."

The court appointed new counsel for A.N. and set a case management conference for February 21, 2012.

**Case Management Conference – February 21, 2012**

At the case management conference on February 21, 2012, the parties and the court discussed the nature of the anticipated "reconsideration" hearing. The court indicated that its statement of decision was completed but still had to be reviewed by the staff attorney. The court confirmed that the written ruling would grant the motion to reconsider.

Petitioners' counsel indicated that she received deposition notices for Erin H., "Mrs. [H.]"[14] and Janet Hunsaker. She expressed concern about the scope of discovery

---

[14] Presumably, petitioner C.H.

Jeremiah was undertaking. Jeremiah's counsel asked what the court envisioned as the scope of the rehearing. The court reviewed its statement of decision on the motion for reconsideration, and stated:

> "I noted that on the record February 8th I ordered a hearing with opportunity to cross-examine witnesses regarding evidence considered by the Court at the guardianship hearing and to present witnesses in rebuttal of the witnesses who are named in written reports considered by the Court at the guardianship hearing. So I envision at this hearing that."

The court later stated, "[T]his is a hearing on the motion to reconsideration [*sic*], not a whole new hearing."

Jeremiah's counsel asked, "So the Court is limiting the testimony to what could have occurred on August 30th; is that correct?" The court responded, "Exactly." The court continued, "I will simply after hearing all that decide upon reconsideration of all the evidence whether there is – whether I should enter a different decision."

The court stated, "[W]e are dealing with an issue that deals with fundamental rights of a parent under the constitutional law to parent their own child. The Court can only remove a child when there's sufficient showing of detriment. There was a showing of detriment based on those statements contained in the report and he didn't have an opportunity to cross-examine the witnesses."

The court stated it would allow A.N., Ms. Hunsaker, and Jeremiah's twin daughters to be called as witnesses at the retrial.

Petitioners' counsel questioned whether the court would consider the Abbiss report at the rehearing. The court responded, "No, I can't consider Ms. Abbiss'[s] report. Mr. Minyard is going to have to prepare a new – I can't consider Ms. Abbiss'[s] report because of the defects in the report. I'm not going to."

**Motion for Increased Visitation**

On March 5, 2012, Jeremiah moved for an order for increased visitations and to permit S.W. to be present at visitations with A.N. Jeremiah filed a declaration in support

of the motion, indicating that he had attended joint counseling with his twins for five months. S.W. had eventually begun attending the sessions as well. Petitioners opposed the motion. The motion was initially heard on March 27, 2012. The parties were referred to counseling, but there was no resolution. The court set a contested hearing on the matter to coincide with the rehearing on the petition for guardianship.

## March 8, 2012, Hearing

On March 8, 2012, there was an ex parte hearing initially intended to resolve a discovery dispute. After discussing the discovery dispute, the parties and the court discussed other issues of the case.

The court verbally ruled that it was allowing Ms. Hunsaker's report into evidence "subject to cross-examination .…"

The court and counsel also discussed the burden of proof at the rehearing.

> "MR. LONG [Jeremiah's counsel]: -- my first question is who has the burden of proof that day to carry, is it us or is it them? That would be my first question and then second is, are they going to be required, once that report is out and the Court has already said on the record that that report was very influential in the Court's decision, so are they going to have to present evidence on April 17th that is clear and convincing so that our job is to refute it or is our job to refute it like the Court's already setting it and we have to tear it down?

> "MS. SMITH-HENSON [Petitioners' counsel]: The burden shifts.

> "THE COURT: What?

> "MS. SMITH-HENSON: I believe the burden shifts. We had clear and convincing burden to get the guardianship. Now we're not doing a new trial, we're not presenting new evidence, you're only making a decision based upon the new evidence whether or not you made an error. I don't believe I have a burden of clear and convincing again. I believe they have a burden to prove –"

> "MR. LONG: If that's the case and, Your Honor, we throw out that report, then she couldn't carry her burden.

> "MS. SMITH-HENSON: Well I may be able to.

25.

"THE COURT: My view is that – that I cannot consider Ms. Abbiss'[s] report absent a stipulation that it come in and that they may then present evidence through cross-examination of hostile witnesses to refute it because that was not possible at the hearing the way it went down. So yes, they would have the burden of going forward and asking me to reconsider .…"

Following the hearing, the court issued a written order. The court ordered that if anyone desired to call A.N. as a witness, the court would address that issue before the April 17, 2012, retrial pursuant to California Rules of Court, rules 5.119 and 5.250, Family Code section 3042, and Evidence Code section 765. The court further ordered that questioning of any other children under the age of 14 would be subject to Evidence Code section 765. The order also stated that the court would not receive the Abbiss report into evidence at retrial, but would consider the statements of witnesses presented in that report "if proper foundation is laid under the Evidence Code .…"

## Rehearing

The rehearing began on April 17, 2012. The reporter's transcript of the rehearing is not part of the appellate record, but the court's ruling after the rehearing is. In the order, dated May 15, 2012, the court "denied" the "request to modify and change the current visitation order .…" The court found "the evidence that has been presented during the hearing of this application further supports the Court's original findings." The order states:

"After an 8 day hearing this Court has heard no evidence or been cited to any law that would lead this Court to determine that the Order Appointing Michael [H.] and [C.H.] as Guardians of [A.N.] should be rescinded .…"

### B.

### ATTORNEY FEES / SANCTIONS

On May 11, 2012, petitioners moved for sanctions under Family Code section 271. Jeremiah opposed the motion, and filed his own motion for attorney fees and costs under

Family Code section 2030 and *In re Guardianship of Paduano* (1989) 215 Cal.App.3d 346.

**June 4, 2012, Order**

In an order dated June 4, 2012, the court granted Jeremiah's request for attorney fees and costs under Family Code section 2030. Jeremiah had requested $98,707.00 in attorney fees, and $6,354.40 in costs. The court granted $10,975.00 in fees. The 23-page order describes Jeremiah's line item requests, and indicates whether each request for fees was granted in whole or in part, or was denied.

**June 11, 2012, Order**

In an order dated June 11, 2012, the court granted petitioners' request for Family Code section 271 sanctions against Jeremiah. The court ruled that, under *Guardianship of Paduano*, *supra*, 215 Cal.App.3d 346, Family Code section 271 sanctions were available because the probate proceedings had been consolidated with family law proceedings. The trial court found that Jeremiah and/or his attorneys had set unnecessary ex parte hearings, filed an unmeritorious writ to this court, filed an unsolicited brief, lodged inappropriate accusations against petitioners, improperly attempted to influence witnesses, and conducted unnecessary depositions. The court sanctioned Jeremiah in the amount of $7,000 to be "set off against the amount of fees he was awarded under Family Code Section 2030 on June 4, 2012."

**ANALYSIS**

**I.**

**THE COURT ERRONEOUSLY CONSIDERED INADMISSIBLE HEARSAY EVIDENCE**

We first address Jeremiah's contention that the court relied on inadmissible hearsay at the initial trial on August 30, 2011.

Generally, unless otherwise permitted by law, hearsay is not admissible in guardianship proceedings. (Evid. Code §§ 300, 1200; Prob. Code § 1000; see also *In re*

*Guardianship of Akers* (1920) 184 Cal. 514, 520; *In re R.S.* (1985) 167 Cal.App.3d 946, 970-971; *In re Guardianship of Sturges* (1939) 30 Cal.App.2d 477, 491; *In re Guardianship of De Brath* (1937) 18 Cal.App.2d 697, 704.)

Respondents' brief does not dispute that, at the initial trial, the court relied on inadmissible hearsay, including statements in Ms. Abbiss's Statement of Issues and Recommendations. Understandably so, given that the trial court itself later characterized the evidence as inadmissible hearsay, stating: "I am reconsidering [the grant of guardianship] on the basis that I believe that the decision I made was based on a great deal of hearsay evidence, which was formerly admissible in family law proceedings but has not been since 2010." [15] Rather, respondents contend that Jeremiah waived the hearsay objection by failing to raise it in the trial court.

The general rule is that the complaining party must make a timely and meaningful objection in the trial court to preserve an evidentiary issue for appeal. (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 101.) But, the duty to object will be excused when an objection would have been futile. (*Ibid*.) For example, when the trial court considers and rules on an evidentiary issue as if an objection had been properly made, appellate review is permitted. (*People v. Frank* (1985) 38 Cal.3d 711, 738, citing *People v. Abbott* (1956) 47 Cal.2d 362, 372-373.)

---

[15] Prior to December 31, 2010, Family Code section 3151, subdivision (a) provided, in part: "The role of the child's counsel is to gather *facts* that bear on the best interests of the child, and present those *facts* to the court .…" Even if this prior version of the statute could be read to trigger the, "except as provided by law" clause of Evidence Code section 1200, subdivision (a), it has since been amended. Effective January 1, 2011, Family Code section 3151, subdivision (a) now reads, in pertinent part: "The role of the child's counsel is to gather *evidence* that bears on the best interests of the child, and present that *admissible* evidence to the court *in any manner appropriate for the counsel of a party....*" (Fam. Code, § 3151, subd. (a), italics and underline added.) Thus, Family Code section 3151, subdivision (a) does not render hearsay admissible merely because it is conveyed by child's counsel.

Here, the court voiced its thoughts on the admissibility of the minor's counsel report before any hearsay objection was made. While ruling on another evidentiary issue at trial, the court digressed: "[A]nd the Court realizes that the things that the child has told Ms. Hunsaker [child's therapist] and Ms. Abbiss [minor's counsel] and possibly the grandparents [petitioners/respondents] are hearsay, the Court tends to allow evidence of those statements as evidence of the child's state of mind which is evidenced in these proceedings .…" Thus, the court discussed the evidentiary issue as though an objection had been made, and we will review the erroneous admission on appeal. (See *People v. Frank*, *supra*, 38 Cal.3d at p. 738.)

## II.

## THE TRIAL COURT'S ERROR WAS PREJUDICIAL

Even though the erroneous admission of hearsay evidence is preserved for appeal, we still must determine whether the error was prejudicial. (Evid. Code, § 353, subd. (b) [no reversal on erroneous admission of evidence absent "miscarriage of justice"].) When reviewing the erroneous admission of hearsay evidence, we employ the *Watson*[16] harmless error test. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 292.) That is, we must determine whether it is "reasonably probable" that Jeremiah would have obtained a more favorable judgment if the court had excluded the evidence. (See *ibid*.) " ' "[P]robability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800, italics in original.)

Our task is greatly simplified by the unusual state of the record before us. At the February 21, 2012, hearing on the motion to reconsider, the finder-of-fact itself (i.e., the trial court) said: "[W]e are dealing with an issue that deals with fundamental rights of a parent under the constitutional law to parent their own child. The Court can only remove

---

[16] *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

a child when there's sufficient showing of detriment. *There was a showing of detriment based on those statements contained in the report ….*" (Italics added.) At the February 8, 2012, hearing, the court stated: "… *I believe that the decision I made was based on a great deal of hearsay* evidence,… And I don't believe under the circumstances that there was a fair hearing and that I could fairly consider all the evidence.…"

We need not speculate on the role the hearsay evidence played in arriving at the judgment. The trial court's statements indicate "with much certainty that the evidence erroneously admitted contributed materially to, if it did not entirely control, the conclusion of the trial court, ultimately expressed in its findings,…" (*In re Guardianship of Akers, supra*, 184 Cal. at p. 521.) "It follows necessarily that the error in this particular warrants and requires a reversal of the order" (*ibid.*) unless we accept respondents' remaining contention that prejudice was "negated" by the order granting a rehearing.

As we will explain in section III, *post*, the court's February 22, 2012, order was an order for a new trial (Code Civ. Proc., § 656), not an order granting reconsideration (Code Civ. Proc., § 1008). In the subsequent section (§ IV, *post*), we explain why the trial court had no authority to make such an order.

## III.

### THE TRIAL COURT'S FEBRUARY 22, 2012, ORDER CONSTITUTED AN ORDER FOR A NEW TRIAL, NOT RECONSIDERATION

Respondents argue that trial courts can reconsider and change an earlier ruling even if such reconsideration is not based upon a change in law. (*Case v. Lazben Financial Co.* (2002) 99 Cal.App.4th 172, 178-179.) But, that is not what the court did here; it ordered a new trial.

Reconsidering a prior order and granting a new trial are separate concepts. (Compare Code Civ. Proc., §1008 with Code Civ. Proc., §§ 656-657.) The former occurs when the court "reconsider[s]" a "matter" (Code Civ. Proc., § 1008, subd. (a)) while the latter is a "re-examination of an issue of fact." (Code Civ. Proc., § 656.)

30.

In determining the true nature of the February 22, 2012, order, we look to its effect, not its label. " 'The true measure of an order … is not an isolated phrase appearing therein, *but its effect* when considered as a whole.…' " (*Concerned Citizens Coalition of Stockton v. City of Stockton* (2005) 128 Cal.App.4th 70, 77, italics added.) Thus, an order purporting to grant reconsideration may in fact be an order for a new trial. (See *In re Marriage of Herr* (2009) 174 Cal.App.4th 1463, 1470 (*Herr*).)

The Court of Appeal encountered a similar situation in *Herr*, *supra*, 174 Cal.App.4th 1463. In *Herr*, there was a trial on various contested issues including child custody, support and arrearages. At the close of trial, the court announced its ruling from the bench. One of the parties moved for reconsideration and, in the alternative, for a new trial. At a subsequent hearing, the court granted reconsideration on its own motion, and set the matter for a further hearing. The court indicated that the matters previously resolved at trial would be revisited and the parties would present new evidence at the anticipated hearing. The *Herr* court reversed the order granting "reconsideration," determining that it was, in fact, an order for a new trial.

As the Court of Appeal explained:

> "[The trial court's] order purported to grant 'reconsideration' for the express purpose of conducting a further hearing or trial, at which the parties would be expected to produce new and 'competent' evidence .…

> "This was no reconsideration: it was the grant of a new trial. The effect of granting a new trial is ' "a re-examination of an issue of fact." ' [Citations.] In expressly rejecting as unreliable or inaccurate evidence adduced at the first trial, the court's order that the parties be prepared to submit new, competent evidence has all of the indicia of a reexamination of issues of fact. *Whatever the court called it, the order was for a new trial.*" (*Herr*, *supra*, 174 Cal.App.4th at p. 1470, italics added.)

The trial court's order in the present case can be described in largely the same fashion. The order states, in part, "this Court is granting Jeremiah [N.'s] motion for reconsideration, and setting a [*sic*] evidentiary hearing to reconsider this court's

31.

appointment of guardianship,…" The order states that the purpose of the further "evidentiary hearing" was:

> "[S]o that this Court may take further evidence on the petition of Michael [H.] and [C.H.] to be appointed guardians of [A.N.] At such hearing the moving party (Jeremiah [N.]) *may call as a witness any person whose statements were considered by the Court in reports before the Court who were not cross-examined at the hearing. He may also present new witnesses to controvert any factual allegation presented in those reports. The guardians may likewise call any witnesses who did not testify but whose statements were made part of any reports considered by the Court and may call witnesses in rebuttal to any testimony presented by witnesses called by the moving party, Jeremiah [N.]"* (Italics added.)

We find it amply clear that this order contemplates a "reexamination" of issues of fact. (Code Civ. Proc., § 656.) The order "has all of the indicia of a reexamination of issues of fact" including the anticipation of new evidence at the rehearing. (*Herr*, *supra*, 174 Cal.App.4th at p. 1470.) That is, the court's order "purported to grant 'reconsideration' for the express purpose of conducting a further hearing or trial, at which the parties would be expected to produce new … evidence." (*Ibid*.)

In sum, the court's "reexamination of factual issues does not fall under the rubric of 'reconsideration.' It is a new trial.…" (*Herr*, *supra*, 174 Cal.App.4th at p. 1465.) And, as we will explain, "the trial court here had no authority to order a new trial,…" (*Ibid*.)

## IV.

### THE COURT LACKED JURISDICTION TO ORDER A NEW TRIAL

"The power of the trial court to grant a new trial may be exercised only by following the statutory procedure and is conditioned upon the timely filing of a motion for new trial,…" (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 899.) A trial court may not order a new trial on its own motion. (*Ibid*.)

These rules operate to unique effect here. In probate proceedings, a party may only move for a new trial in cases where the right to a jury trial is expressly granted by

32.

Division 4 of the Probate Code. (Prob. Code, § 1453.) Division 4 does not expressly grant a right to a jury trial in the probate guardianship proceedings that underlie this appeal. (See Prob. Code, § 1452.) Therefore, the parties were statutorily prohibited from moving for a new trial. (Prob. Code, § 1453.)

Since the court's authority to order a new trial was conditioned upon a motion that could not be made, it had no jurisdiction to order a new trial. (Cf. *Estate of Van Deusen* (1947) 30 Cal.2d 285, 292.)[17]

Thus the court's order for a new trial did not negate the prejudice from the first trial's errors, it simply "replaced one error with a different error." (*People v. Felton* (2004) 122 Cal.App.4th 260, 271.) An extrajurisdictional order for a new trial is void and " 'remains without effect completely as if never entered.' " (*Peters v. Anderson* (1931) 113 Cal.App. 158, 160, italics omitted.)

## V.

## REMEDY

## ONLY REVIEWING COURTS MAY ORDER NEW TRIALS IN THIS CONTEXT, NOTWITHSTANDING ANY PROCEDURAL INEFFICIENCIES THE RULE CREATES

An argument could be made that if the trial court recognizes a trial error, it should be able to correct it through a new trial without the necessity of an appeal. Perhaps, but it is not our role to evaluate whether the Legislature could have designed a more efficient system. We do not determine what the Legislature should have done, but rather what it has done. "Our limited role in interpreting statutes is to follow the Legislature's intent as exhibited by the plain meaning of the statutory language, whatever we may think of the wisdom, expediency, or policy underlying the act. [Citations.]" (*Bradley v. Breen* (1999) 73 Cal.App.4th 798, 806.)

---

[17] Reviewing courts, however, do have statutory authority to order new trials in this context. (Prob. Code, § 1000; Code Civ. Proc., § 906.)

"A motion for a new trial is only a statutory remedy. [Citation.] There is nothing in the Constitution pertaining to it, and if the Legislature has seen fit to authorize an appeal direct from the judgment in a special proceeding of this character without extending to the court the power of granting a new trial, no discrimination is set up." (*Board of Education v. Mulcahy* (1942) 50 Cal.App.2d 418, 423.)

"As the motion for a new trial finds both its source and its limitations in the statutes [citation], the procedural steps prescribed by law for making and determining such a motion are mandatory and must be strictly followed [citations.] Applying this rule, it has uniformly been held that an order granting a new trial is in excess of jurisdiction and void if, for example, it is made in a proceeding in which the remedy of new trial is not available [citation] .…" (*Mercer v. Perez* (1968) 68 Cal.2d 104, 118.)

## EVEN IF THE PROBATE COURT COULD HAVE ORDERED A NEW TRIAL; THE REHEARING ORDER DOES NOT NEGATE THE PREJUDICE FROM THE FIRST TRIAL'S ERROR

Moreover, while the rehearing was a new trial in the statutory sense (i.e., it reexamined an issue of fact), it was not "new" in the remedial sense because the burden of persuasion was improperly placed on Jeremiah. At the March 8, 2012, hearing, the court indicated that, at the rehearing, it would be *Jeremiah*'s burden "of going forward and asking [the court] to reconsider .…" And, the order after the rehearing states: "This Court has heard no new evidence or been cited to any new law which would lead it to the conclusion that its decision made on August 30, 2011 should be changed.…" [18]

At a truly "new" trial, Jeremiah would not have had the burden of trying to change a prior decision. Rather, the nonparent petitioners would have the burden of proving parental custody is detrimental to the child. (Evid. Code § 500; *Guardianship of Olivia J.*

---

[18] We understand the court's description of its decision in these terms given that it did not view the rehearing as a second trial. But that is the point. The mischaracterization of the rehearing led to an improper allocation of the burden of proof. This is why the rehearing order did not negate the prejudice from the first trial.

(2000) 84 Cal.App.4th 1146, 1161-1162 ["We also caution that because of the strong preference for parental custody, *and the heavy burden a nonparent must carry of demonstrating that parental custody is detrimental to the child*, a petition for guardianship is an intrusive and limited remedy .…" (Italics added.)].) Before a court can grant custody to a nonparent over a parent's objection, it must find that granting custody to the parent would be detrimental to the child and that granting custody to the nonparent is required to serve the best interest of the child. (Fam. Code, § 3041, subd. (a).) The finding that parental custody would be detrimental to the child must be supported by "clear and convincing evidence." (Fam. Code, § 3041, subd. (b).) The "nonparent must carry" this burden.[19] (*In re Guardianship of Olivia J.*, *supra*, 84 Cal.App.4th at pp. 1161-1162.)

## V.

## ATTORNEY FEES

Jeremiah also challenges two orders regarding attorney fees. On June 4, 2012, the court granted Jeremiah's request for attorney fees under Family Code section 2030, but awarded less than he requested. On June 11, 2012, the court granted petitioners' request for sanctions under Family Code section 271.

Jeremiah essentially argues that there was insufficient evidence to support the two orders. He also attacks the June 11 order on the basis that Family Code section 271 does not apply to these proceedings.

Respondent contends that Jeremiah has failed to provide an adequate record to review whether the two orders were supported by substantial evidence. We agree, with one exception. While Jeremiah's failure to provide an adequate record precludes review of his sufficiency-of-the-evidence attacks on the two orders, his statutory construction

---

[19] We are only identifying the appropriate burden of proof. We express no opinion as to the appropriate outcome of the new trial on remand.

argument regarding the applicability of Family Code section 271 survives. We therefore consider that contention, but ultimately reject it.

## STANDARD OF REVIEW

We review Jeremiah's challenges to the orders under different standards of review. "To the extent that we are called upon to interpret the statutes relied on by the trial court to impose sanctions, we apply a de novo standard of review. [Citation.] We review any findings of fact that formed the basis for the award of sanctions under a substantial evidence standard of review. [Citation.]" (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1479.)

We may affirm the sanctions order on any ground supported by the record. (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225.) We resolve all conflicts against the sanctioned party and indulge all legitimate and reasonable inferences to support the sanction. (*In re Feldman*, *supra*, 153 Cal.App.4th at p. 1479.) We will only overturn a sanction if, after employing this deferential review, we conclude that " 'no judge could reasonably make that order.' [Citations.]" (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 995.) When an appellant fails to include a reporter's transcript necessary to evaluate an attack on an order imposing sanctions, we presume the order is correct. (*Parker v. Harbert* (2012) 212 Cal.App.4th 1172, 1178. See also *Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445.)

## JEREMIAH FAILED TO PROVIDE AN ADEQUATE RECORD

### *June 11, 2012, Order Imposing Family Code section 271 sanctions*

Family Code section 271 permits an "award of attorney's fees and costs" based on "the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys.…" (Fam. Code, § 271, subd. (a).)

Jeremiah contends that sanctions under this section were "unjustified." We cannot reach this contention because he has failed to provide a reporter's transcript of relevant proceedings, (i.e., the rehearing). (See *Parker v. Harbert*, *supra*, 212 Cal.App.4th at p. 1178.) Jeremiah contends that the "fees/sanctions question" was determined without a hearing and therefore no reporter's transcript was necessary.

However, the order indicates that the rehearing was relevant. For example, the order indicated: "The time for resolution of Mr. [N.'s] Motion for Reconsideration was unquestionably lengthened by his taking of depositions of various witnesses he expected to call at the hearing.… *At the hearing there was no deposition testimony that was helpful to Mr. [N.'s] claim ….*"[20]

Additionally, Family Code section 271 requires the trial court to consider "all evidence" regarding the parties' "income, assets, and liabilities." (Fam. Code, § 271, subd. (a).) In their moving papers filed in the trial court, petitioners argued: "*During testimony at the motion for reconsideration,* Mr. [N.] testified that he has not paid a single penny out of his own pocket for his litigation. He testified that his mother gave him $7,500.00 for which there was no agreement to pay her back and the rest of the litigation has been bank rolled by his attorneys. Mr. [N.] also testified at trial that he has no idea how his expert witness, Dr. Gandolfo, was going to be paid, or how Judge Broadman was going to be paid for mediation.…" (Italics added.) We have no ability to review Jeremiah's testimony at the rehearing without the reporter's transcript.

_____

[20] We note sanctions would likely not be appropriate where a party sincerely, but incorrectly, believes a deposition will constitute or lead to discovery of favorable, relevant evidence. But, Family Code section 271 does encompass the conduct of a party who knowingly pursues irrelevant discovery to increase the cost of the litigation and frustrate settlement. (See Fam. Code, § 271, subd. (a).) Without an adequate record, we do not know whether Jeremiah's discovery-related litigation tactics rose to this level. "[W]e presume the court's order is correct and indulge all presumptions and intendments in its favor on matters as to which the record is silent. [Citation.]" (*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1217.)

Sanctions under Family Code section 271 "need not 'be limited to the cost to the other side resulting from the bad conduct.' [Citation.]" (*In re Marriage of Corona, supra*, 172 Cal.App.4th at p. 1226.) And, the statute "does not require a correlation between the sanctioned conduct and the specific attorney fees,…" (*Ibid.*) Therefore, our inability to review even some of the potential justifications for the award under Family Code section 271 precludes reversal of the order.

*June 4, 2012, Order Awarding Attorney Fees Under Family Code Section 2030*

Family Code section 2030 requires courts to ensure equal access to legal representation in proceedings for "dissolution of marriage, nullity of marriage, or legal separation of the parties, and in any proceeding subsequent to entry of a related judgment,…" (Fam. Code, § 2030, subd. (a)(1).) The statute authorizes, when necessary, a court order requiring one party to pay to the other party "whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." (*Ibid.*)

The failure to include a transcript of the rehearing is fatal to appellate review of the order granting fees under this section.

The order itself demonstrates that the rehearing was a relevant proceeding. The order notes that Jeremiah hired "not one, but two attorneys," even though Jeremiah's income and expense declaration indicated he was earning only $1,600 per month and *he testified at rehearing* that his income from bartending tips was negligible. The court made an adverse credibility finding on this basis, determining that Jeremiah's testimony at the rehearing describing his tip income as negligible "does not stand up to common sense and experience." (See Evid. Code, § 780, subd. (b).) Jeremiah's testimony at rehearing is relevant to the June 4, 2012, order.

Moreover, Family Code section 2030 provides for an award of attorney fees in "whatever amount is *reasonably necessary* for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." (Fam.

Code, § 2030, subd. (a)(1), italics added.)  Many of the trial court's fee reductions were based on the court's conclusion that the services were not "reasonable" or "necessary" *in light of the rehearing*.  For example, the court ruled that attorney services "in connection with the retention of and *testimony* by Dr. Gandolfo were not necessary," "resulted in an undue consumption of time," and were only "marginally probative."  The court denied fees for correspondence regarding depositions because the court found "no good reason for expending time and effort on the depositions of witnesses" at the reconsideration hearing.  Additionally, the court further reduced the fee amount because the rehearing consumed 8 days when "it could have reasonably concluded in four days."  The court determined the delay was due to "unnecessary consumption of time" by Jeremiah's counsel.  We have no ability to review these determinations and presume they were correct.

### JEREMIAH HAS NOT DISTINGUISHED *PADUANO*

However, the lack of a reporter's transcript for the rehearing does not impede our consideration of Jeremiah's statutory construction argument that Family Code section 271 does not apply to the instant proceedings at all.  Relying on *Guardianship of Paduano, supra*, 215 Cal.App.3d 346 (*Paduano*), the trial court determined that Family Code section 271 sanctions were available.  In *Paduano*, the Court of Appeal held that then-Civil Code 4370, subdivision (a)[21] attorney fees applied to consolidated guardianship and family law proceedings where "the issue to be resolved is custody of a minor child of the marriage."  (*Paduano*, *supra*, 215 Cal.App.3d at p. 352.)

The present appeal concerns a different attorney fees statute than *Paduano*, namely, Family Code section 271.  Jeremiah contends this distinction is significant because Family Code section 2030 (and its predecessor statute at issue in *Paduano*)

---

[21] Now Family Code section 2030.  (*Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 639, fn. 7.)

39.

contains more expansive language describing applicable proceedings compared to section 271. We disagree. By its express terms, Family Code section 2030 applies to "a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties, and in any proceeding subsequent to entry of a related judgment." (Fam. Code, § 2030, subd. (a).) Family Code section 271 contains no equivalent language limiting its applicability to particular types of proceedings. The absence of this limiting language suggests that section 271 encompasses at least as broad a category of "proceedings" as Family Code section 2030.

More importantly, the *Paduano* decision was not focused on the language of the attorney fees statute, but rather on the consolidated nature of the proceedings and the similarity of their subject matter. (*Paduano*, *supra*, 215 Cal.App.3d at p. 350.) We read *Paduano* as holding that when a probate guardianship proceeding is consolidated with a marriage dissolution action for the purpose of determining custody, Family Code attorney fees provisions apply. Absent any express provision in Family Code section 271 limiting its applicability in a more restrictive manner than Family Code section 2030, we fail to see how *Paduano* can be distinguished.

## VI.

## ALLEGATIONS OF TRIAL COURT BIAS

We close by briefly addressing Jeremiah's claims of pervasive bias on the part of the trial court. Jeremiah's brief is replete with accusations of bias and impropriety stemming from the adverse rulings outlined above. The record does not support these contentions. To the contrary, the court's extrajurisdictional order for a new trial appears to have been borne out of a sincere concern for Jeremiah's due process rights. That is, the court seems to have done much within its power (and some things beyond its power) to ensure a fair ruling on the petition. We are reversing the judgment in spite of Jeremiah's disparagement of the trial court, not because of it.

**DISPOSITION**

The June 4, 2012, and June 11, 2012, orders are affirmed. The trial court's order granting respondents' petition for guardianship of A.N. is reversed. The letters of guardianship are revoked. The matter is remanded for a new trial on the guardianship petition.

_____

Poochigian, J.

WE CONCUR:

_____

Gomes, Acting P.J.

_____

Detjen, J.

41.